[Cite as *State v. Brinkley*, 2017-Ohio-1269.]

STATE OF OHIO          )               IN THE COURT OF APPEALS
                          )ss:           NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT    )

STATE OF OHIO                        C.A. No.     28238

     Appellee

     v.                               APPEAL FROM JUDGMENT
                                   ENTERED IN THE
JURMAINE K. BRINKLEY         COURT OF COMMON PLEAS
                                   COUNTY OF SUMMIT, OHIO
     Appellant                    CASE No.     CR 15 12 3742

DECISION AND JOURNAL ENTRY

Dated: April 5, 2017

TEODOSIO, Judge.

**{¶1}** Appellant, Jurmaine K. Brinkley, appeals his conviction and sentence from the Summit County Court of Common Pleas, finding him guilty of aggravated robbery with a firearm specification, and sentencing him to a total of thirteen years. This Court affirms.

I.

**{¶2}** Mr. Brinkley was arrested and charged with aggravated robbery with a firearm specification stemming from the robbery of a convenience store on November 16, 2015. The case went to trial and the jury found Mr. Brinkley guilty. The trial court sentenced Mr. Brinkley to ten years for the offense of aggravated robbery and imposed a mandatory three-year sentence on the firearm specification to run consecutively as required by law. Mr. Brinkley now appeals, raising four assignments of error, which have been reordered for the purpose of discussion.

II.

ASSIGNMENT OF ERROR THREE

THE TRIAL COURT ERRED AS A MATTER OF LAW BECAUSE THE STATE FAILED TO ESTABLISH ON THE RECORD THAT THERE WAS SUFFICIENT EVIDENCE TO SUPPORT A CONVICTION.

ASSIGMENT OF ERROR ONE

APPELLANT'S CONVICTION WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE AND THE JURY LOST ITS WAY WHEN IT FOUND THE APPELLANT GUILTY.

**{¶3}** In his third assignment of error, Mr. Brinkley argues the trial court erred when it overruled his Crim.R. 29 motion for acquittal and submitted the case to the jury for deliberations. In his first assignment of error, Mr. Brinkley argues the manifest weight of the evidence does not support his conviction. We disagree with both arguments. The Court notes that Mr. Brinkley does not challenge the fact that an aggravated robbery occurred, but rather disputes that he was the offender.

Factual Background

**{¶4}** Shortly after midnight on November 16, 2015, Mr. Brinkley entered a convenience store, walked down an aisle, and left soon thereafter without purchasing anything. Mr. Brinkley lived with his siblings and their grandmother about a three-minute walk away from the store. Approximately twenty minutes later, a man dressed in black entered the store, pointed a gun at the cashier's face, and demanded that she put the register money in a bag he was holding. The man was dressed in black, his face covered by black fabric and his head covered by the hood of his sweatshirt. The cashier opened the registers and put the money in the bag as instructed. After the gunman left, the police were called.

{¶5}    At trial, the cashier testified that she knew Mr. Brinkley by sight, though not by name, as he had come into the store a few times before.  She denied ever having a conversation with Mr. Brinkley, or ever hearing his voice, but said that she had approximately four prior interactions with him.  On the night of the robbery, the cashier was working alone, and had asked one of the regular customers to stay with her while Mr. Brinkley was in the store because of feeling a "weird vibe."

{¶6}    The cashier testified that the gunman was wearing fishnet-like hosiery over his head and a black hood with drawstrings.  She said that his voice was not familiar to her.  She stated that although she could not see his hair, she could still see his face through the hosiery, and recognized him as the regular customer who had been in the store earlier that night, who was later identified as Mr. Brinkley.  Although she was looking down for much of her interaction with the gunman, she testified that she had no doubt that it was Mr. Brinkley and that he was holding a gun.  The cashier estimated the gunman's height as between six feet to six feet and four inches.  Mr. Brinkley testified that his actual height was six feet and three inches.  The cashier later identified Mr. Brinkley from a police photograph array, and identified Mr. Brinkley in the courtroom at trial.

{¶7}    Mr. Brinkley's grandmother testified that she has had custody of her grandson since he was two or three years old and that he lives with her and his siblings within walking distance of the convenience store.  After she had learned of the robbery and that the police were looking for her grandson, she arranged to watch the store surveillance video from that night.  She gave a written statement to the police, produced as evidence by the prosecution, which provided: "I watched the video at the [convenience store] and that is my grandson, Jurmaine Brinkley.  The video was the robbery of [the store]."  She further testified that Mr. Brinkley did not return home

after the morning of November 16, and that she did not know his whereabouts for one or two days, until she was informed that he was in Michigan. Upon being shown the video at trial, the grandmother testified that she was not sure if the gunman was her grandson. Upon cross-examination, she testified that she had been mistaken when she gave her statement to the police, and that it was not her grandson in the video.

### Sufficiency of the Evidence

{¶8} Whether the evidence in a case is legally sufficient to sustain a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "In essence, sufficiency is a test of adequacy." *Id*. This Court reviews questions of law under a de novo standard. *State v. Trifari,* 9th Dist. Medina No. 08CA0043–M, 2009–Ohio–667, ¶ 12.

{¶9} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*.

{¶10} Mr. Brinkley contends that no rational trier of fact could have found that he committed aggravated robbery beyond a reasonable doubt, and specifically, even viewing the evidence in a light most favorable to the prosecution, the State failed to produce sufficient evidence that Mr. Brinkley robbed the convenience store with a firearm. He states that the only evidence provided was from one eyewitness, the cashier at the convenience store, and claims her testimony differed substantially from her original statement. We note that the credibility of a

witness is properly addressed under a manifest weight of the evidence analysis, and is done so below.

{¶11}  The offense of aggravated robbery is committed when a defendant, in committing or attempting to commit a theft offense, or in fleeing immediately thereafter, had a firearm on or about his person or under his control, and either displayed the weapon, brandished it, or indicated that he possessed it.  R.C. 2911.01.  As Mr. Brinkley notes under his first assignment of error, he "does not challenge the fact that an aggravated robbery occurred," rather, "[t]he main issue in this case lies with identification."  He makes no argument to dispute any other element of the crime of aggravated robbery.

{¶12}  Based upon the testimony as recounted above, a rational trier of fact could reasonably have found, beyond a reasonable doubt, that Mr. Brinkley committed the offense.  Viewing the evidence in a light most favorable to the State, there is sufficient evidence to support a finding that Mr. Brinkley committed the crime of aggravated robbery.  Mr. Brinkley's third assignment of error is overruled.

Manifest Weight of the Evidence

{¶13}  "In determining whether a conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).  Weight of the evidence concerns whether a greater amount of credible evidence supports one side of the issue than supports the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).  Further, when reversing a conviction on the basis that the

conviction was against the manifest weight of the evidence, "the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.*, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should only exercise its power to reverse a judgment as against the manifest weight of the evidence in exceptional cases in which the evidence weighs heavily against the conviction. *Otten* at 340.

{¶14} "A conviction is not against the manifest weight of the evidence merely because there is conflicting evidence before the trier of fact." *State v. Haydon*, 9th Dist. Summit No. 19094, 1999 WL 1260298, *7 (Dec. 22, 1999). An appellate court will not overturn a judgment on this basis alone, and may not merely substitute its judgment for that of the factfinder. *State v. Serva*, 9th Dist. Summit No. 23323, 2007–Ohio–3060, ¶ 8.

{¶15} This Court recognizes that "the trier of fact is in the best position to determine the credibility of witnesses and evaluate their testimony accordingly." *State v. Johnson*, 9th Dist. Summit No. 25161, 2010–Ohio–3296, ¶ 15. We will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version. *State v. Tabassum*, 9th Dist. Summit No. 25568, 2011–Ohio–6790, ¶ 27.

{¶16} Mr. Brinkley takes issue with several components of the cashier's testimony identifying him as the gunman. At trial, the cashier stated that she could see the gunman's complexion, however when she gave her statement to the police on the night of the robbery, she told them she did not know the gunman's complexion. She also acknowledged that she did not mention to the police that the gunman had a scar on his face. Mr. Brinkley has a prominent scar that runs from his nose to the back of his cheek. With regard to the police photograph array, the cashier acknowledged that the other men pictured looked quite different from Mr. Brinkley.

{¶17} On cross-examination, the cashier admitted that her feelings of uneasiness that night were due to the fact that she was alone for the first time, and that her awkward feeling with regard to Mr. Brinkley was based upon other times he had been in the store. She stated her unease was also partly due to her knowledge that Mr. Brinkley had said something of a sexual nature to one of her co-workers. She further testified that it was not uncommon for customers to leave without buying anything.

{¶18} The cashier acknowledged that from the angle of the store's surveillance video it appeared that the gunman was wearing a solid black mask, but maintained that, in person, it was actually see-through hosiery that covered his face. She also acknowledged looking down for an extended period of time as she was putting money into the bag; however, she testified that she was able to look at the gunman's face as she went to the register, but was trying to avoid eye contact: "[O]nce I looked at him I knew it was him and I [did not] want to keep just staring." The cashier also stated that it was not possible that she was mistaken as to the gunman's identity and that she was "positive" it was Mr. Brinkley. In his own defense, Mr. Brinkley testified that he did not commit the aggravated robbery and found the idea "stupid."

{¶19} There is conflicting testimony regarding whether the cashier had ever previously spoken with Mr. Brinkley. Mr. Brinkley testified that he had several previous encounters with the cashier who was working on the night of the robbery. He testified that on one occasion he gave her a note stating that he was shy, but thought she was beautiful, and asked her to call him. He noted he did not actually speak to her on that occasion. He testified that he did speak to her briefly when he ordered some pizza from her and told her he had to return home for money, as he only lived three minutes away. He also stated that he talked to her when he wrote a "little sexual

suggestion," which she rejected. He said that as a consequence, things were then awkward between them.

{¶20} Although an Akron police officer originally testified the cashier told him she had prior conversations with Mr. Brinkley, this statement was later clarified by the officer, who stated that he had inferred that there had been a conversation, though the cashier had only told him she had seen Mr. Brinkley in the store on prior occasions, and not that she had spoken with him.

{¶21} There is also the issue of the grandmother's testimony, which contradicts the statement she gave to the police. On cross-examination, the grandmother testified that she had been mistaken when she identified her grandson as the gunman. She testified that she did not recognize the clothes the gunman was wearing, and that he appeared to have a lighter complexion and thicker calf muscles than her grandson. She also stated that she knew Mr. Brinkley had made plans to go to Michigan to see his grandfather, but did not know the exact date of the trip. Mr. Brinkley testified that he did not tell his grandmother he was leaving because he wanted it to be a surprise.

{¶22} Mr. Brinkley also claims there are multiple problems with the police investigation that occurred during this case. He points to the fact that the police did not find the clothing worn by the gunman, did not find the weapon, and did not obtain any search warrants. In addition, Mr. Brinkley points to the testimony of an Akron police detective who stated that he "didn't do as good of a job as [he] could have" with regard to the case. These details support the argument that there could have been more evidence established in this case; they do not support the argument that there was not enough evidence to sustain a conviction. Finally, Mr. Brinkley's assertion that he could not have had enough time to change clothes in the fifteen to twenty

minutes separating his leaving the store from the gunman entering the store is not supported by his own testimony that he lived only three minutes away.

{¶23} The Court notes that Mr. Brinkley also refers to being prejudiced by the police photograph array shown to the cashier because the men in the photographs looked substantially different from him. Mr. Brinkley did not object to the array at trial and this issue was not raised as an assignment of error. Therefore this issue is not properly before this Court.

{¶24} Having reviewed the record, we cannot say that the jury clearly lost its way or created a manifest miscarriage of justice in choosing the State's version of the events. "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony." *State v. Gilliam*, 9th Dist. Lorain No. 97CA006757, 1998 WL 487085, *2 (Aug. 12, 1998). Mr. Brinkley's first assignment of error is overruled.

## ASSIGNMENT OF ERROR TWO

THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY OVERRULING APPELLANT'S OBJECTION TO THE STATE'S USE OF ITS [PEREMPTORY] CHALLENGE EXCLUDING AN AFRICAN AMERICAN AND NOT FOLLOWING THE PROCEDURE SET FORTH IN [BATSON] V. KENTUCKY IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE [UNITED] STATES CONSTITUTION AND SECTION 10, ARTICLE 1 OF THE OHIO CONSTITUTION.

{¶25} In his second assignment of error, Mr. Brinkley contends that the trial court erred in overruling his objection to the State's use of a peremptory challenge to exclude an African-American juror. He argues the reasons provided for dismissing Juror Number 1 were a pretext for eliminating one of two African-American jurors. We disagree.

{¶26} The Equal Protection Clause of the United States Constitution prohibits deliberate discrimination based on race by a prosecutor in the exercise of peremptory challenges. *Batson v.*

*Kentucky*, 476 U.S. 79, 89 (1986). "A court adjudicates a *Batson* claim in three steps." *State v. Murphy*, 91 Ohio St.3d 516, 528 (2001). "First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination. Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge." *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, ¶ 106, citing *Batson* at 96-98. "Finally, the trial court must decide based on all the circumstances, whether the opponent has proved purposeful racial discrimination." *Id.* "The judge must 'assess the plausibility' of the prosecutor's reason for striking the juror 'in light of all evidence with a bearing on it.'" *State v. Pickens*, 141 Ohio St.3d 462, 2014–Ohio–5445, ¶ 63, quoting *Miller–El v. Dretke*, 545 U.S. 231, 252 (2005). A trial court's findings of no discriminatory intent will not be reversed on appeal unless clearly erroneous. *State v. Hernandez*, 63 Ohio St.3d 577, 583 (1992), following *Hernandez v. New York*, 500 U.S. 352 (1991).

**{¶27}** Here, the State exercised a peremptory challenge to excuse Juror No. 1, an African–American female, and one of two African-Americans seated among the first twelve jurors. The State indicated that it anticipated a *Batson* challenge from the defense, and it provided the following as racially-neutral reasons in support of its challenge: (1) Juror No. 1 had been sleeping through the majority of the Defendant's voir dire, and (2) Juror No. 1 was on a criminal jury approximately two years ago and returned a "not guilty" verdict. Mr. Brinkley raised a *Batson* challenge, arguing that the given reasons were a pretext. The trial court determined that the State's given reasons for challenging the prospective juror were race-neutral. Mr. Brinkley disputes that the juror was sleeping, and further argues that several other jurors had previously been involved in a trial.

{¶28} Although defense counsel did not observe the juror sleeping, and suggested that some people listen with their eyes closed, the trial court judge confirmed that she saw the juror sleeping, and that "it was pretty obvious that she was out like a light." The judge also noted that there were two other African-Americans in the jury pool outside of the first twelve.

{¶29} The United States Supreme Court has explained that the racially neutral explanation that the prosecution is required to provide at the second step of the analysis "means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360 (1991). A prosecutor's explanation for using a peremptory challenge on a juror does not have "to rise to the level justifying exercise of a challenge for cause." *State v. Frazier*, 115 Ohio St.3d 139, 2007–Ohio–5048, ¶ 97, quoting *Batson v. Kentucky*, 476 U.S. 79, 97 (1986). In fact, "a peremptory challenge may be exercised for *any* racially-neutral reason." *State v. Moss*, 9th Dist. Summit No. 24511, 2009–Ohio–3866, ¶ 12.

{¶30} There is no clear error in the trial court's determination. The likelihood that the juror was asleep during voir dire, coupled with her sitting on a criminal jury that returned a "not guilty" verdict only two years earlier, gave rise to more than one racially neutral reason why the State might want to exercise a peremptory challenge. There was no discriminatory intent inherent in the prosecutor's explanations. We further note that there is no pattern of excusing African-American jurors from the venire apparent in the record, and the State did not express similar concerns about any nonminority jurors who were permitted to serve, so there is no indication of disparate treatment. Accordingly, we conclude that the State satisfied its obligation

to provide a racially neutral explanation for the challenge under the second step of the *Batson* analysis. The trial court did not clearly err when it determined that the prosecution had credible racially neutral reasons for excluding the African–American juror. Mr. Brinkley's second assignment of error is overruled.

## ASSIGNMENT OF ERROR FOUR

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IMPOSING APPELLANT'S SENTENCE.

**{¶31}** In his fourth assignment of error, Mr. Brinkley contends that the trial court's sentence was unreasonable, and thus, an abuse of discretion. We disagree.

**{¶32}** In reviewing a felony sentence, "[t]he appellate court's standard for review is not whether the sentencing court abused its discretion." R.C. 2953.08(G)(2). "[A]n appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence" that: (1) "the record does not support the trial court's findings under relevant statutes," or (2) "the sentence is otherwise contrary to law." *State v. Marcum*, 146 Ohio St.3d 516, 2016–Ohio–1002, ¶ 1. Clear and convincing evidence is that "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**{¶33}** The Supreme Court of Ohio has held that "[t]rial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." *State v. Foster*, 109 Ohio St.3d 1, 2006–Ohio–856, paragraph seven of the syllabus. Where the trial court does not put on the record its consideration of R.C. 2929.11 and 2929.12, it is presumed that the trial court gave proper consideration to those statutes. *State v. Kalish*, 120 Ohio St.3d 23, 2008–Ohio–4912, ¶ 18 fn. 4. "Unless the record shows that the court failed to

consider the factors, or that the sentence is 'strikingly inconsistent' with the factors, the court is presumed to have considered the statutory factors if the sentence is within the statutory range." *State v. Fernandez*, 9th Dist. Medina No. 13CA0054–M, 2014–Ohio–3651, ¶ 8, quoting *State v. Boysel*, 2d Dist. Clark No. 2013–CA–78, 2014–Ohio–1272, ¶ 13.

**{¶34}** In support of his argument that the trial court's sentence was unreasonable, Mr. Brinkley raises multiple issues. He states that there is no evidence that he committed the offense, that he has maintained his innocence throughout the process, and that there is a low probability of recidivism because it is his first offense. Mr. Brinkley further contends that the trial court failed to adequately make the requisite findings, but fails to indicate the potential findings to which he is referring.

**{¶35}** At sentencing, the trial court noted that it was already Mr. Brinkley's first offense at just turning eighteen years old. The court further stated that Mr. Brinkley was dangerous to the community and had no consideration for the consequences of his actions or for other people. The court considered the fact that Mr. Brinkley left the area for Michigan after the crime was committed, and found no evidence of remorse. The court also noted his behavior at the jail as indicative of his disregard for society, rules and regulations, and authority in general, and pointed to the video of the crime as showing a person with no consideration for human life. Mr. Brinkley was then given a sentence of ten years for the offense of aggravated robbery, a felony of the first degree, and a three-year mandatory sentence on the firearm specification, to run consecutively, by law, for a total sentence of thirteen years.

**{¶36}** Mr. Brinkley does not dispute that his sentence falls within the statutory range. The trial court's journal entry of April 22, 2016, states that the court considered the principles and purposes of sentencing under R.C. 2929.11 and the seriousness and recidivism factors under

R.C. 2929.12. The record, therefore, does not show that the court failed to consider those factors, including the potentially mitigating factors listed by Mr. Brinkley. Furthermore, the record does not show that the sentence is strikingly inconsistent with the factors.

{¶37} Finally, Mr. Brinkley contends that the trial court utilized inadmissible information while making its sentencing decision. Specifically, Mr. Brinkley refers to the trial court's comments at sentencing:

> And while I very rarely consider, and I'm not considering as outside information, his behavior while at the Summit County Jail, while I'm not taking individual incidents into account with regard[] to sentencing, what his behavior does show me is he is unwilling to abide by the norms of society, rules and regulations, and anything that has to do with anybody showing any type of authority.

{¶38} "It is well-settled that the court may, in the sentencing process, consider information which would have been inadmissible at trial." *State v. Cassidy*, 21 Ohio App.3d 100, 101 (9th Dist.1984). "At sentencing the court is not concerned with the guilt or innocence of the defendant, but rather with imposing an appropriate sentence based upon the seriousness of the crime committed and the character of the defendant." *Id*. The trial court made clear that it did not take individual incidents at the jail into account with regard to sentencing, but rather considered the behavior as evidence of Mr. Brinkley's character. Mr. Brinkley fails to show that any such factors that may be indicative of his character are inadmissible for purposes of sentencing and provides no case law in support of such a theory.

{¶39} Accordingly, we conclude that the trial court did not err by imposing a thirteen-year sentence in this matter as such a sentence is neither unwarranted nor clearly and convincingly contrary to law. Mr. Brinkley's fourth assignment of error is overruled.

III.

**{¶40}** Mr. Brinkley's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

CARR, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

JASON D. WALLACE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.